SUMMARY MEMORANDUM AND OPINION; NOT INTENDED FOR PUBLICATION IN
THE OFFICIAL REPORTERS

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ELLA WARD,**<br><br>　　　　　　　　　Plaintiff,<br><br>　　v.<br><br>**ERIC K. SHINSEKI, Secretary,**<br>**U.S. Department of Veterans Affairs,**<br><br>　　　　　　　　　Defendant. | Civil Action No. 10-cv-1414 (RLW) |

## MEMORANDUM OPINION[1]

Plaintiff Ella Ward worked as an attorney for the Department of Veterans Affairs ("Department") between 2001 and 2007. She filed a complaint against the Department in August 2010 claiming two violations of the Rehabilitation Act, 29 U.S.C. § 791 *et seq.*: Failure to Accommodate and Constructive Discharge. (Dkt. No. 1). Both Ms. Ward and the Department have moved for summary judgment. (Dkt. Nos. 25 & 26). Because no material facts are in dispute, the time for a decision is ripe. After careful consideration of the materials submitted by both parties, for the reasons below the Court finds that the Defendant's Motion for Summary Judgment, (Dkt. No. 25), is granted, and Plaintiff's Motion for Summary Judgment, (Dkt. No. 26), is denied.

---

[1] This unpublished memorandum opinion is intended solely to inform the parties and any reviewing court of the basis for the instant ruling, or alternatively, to assist in any potential future analysis of the *res judicata*, law of the case, or preclusive effect of the ruling. The Court has designated this opinion as "not intended for publication," but this Court cannot prevent or prohibit the publication of this opinion in the various and sundry electronic and legal databases (as it is a public document), and this Court cannot prevent or prohibit the citation of this opinion by counsel. Cf. Fed. R. App. P. 32.1. Nonetheless, as stated in the operational handbook adopted by our Court of Appeals, "counsel are reminded that the Court's decision to issue an unpublished disposition means that the Court sees no precedential value in that disposition." D.C. Circuit Handbook of Practice and Internal Procedures 43 (2011).

1

SUMMARY MEMORANDUM AND OPINION; NOT INTENDED FOR PUBLICATION IN THE OFFICIAL REPORTERS

**I. Factual Background**

The Department hired Ms. Ward around June 2001 as an attorney advisor. (Dkt. No. 26, Ex. 1). Attorney advisors at the Department review appeals submitted by U.S. veterans and prepare draft opinions. Initially hired at the GS-11 level, the Department continued to promote her, eventually to GS-14 Step 2. (Id.).

Attorney advisors are required to complete 156 case credits per year, an average of three per week. (Dkt. No. 25, Ex. 1 ("Ward Dep.") at 20:11-21:17). With some exceptions, each case is one credit. Although three credits per week was not a rule, it was a goal known as a "fair share goal." Attorney advisors had some limited physical requirements as well, including picking up case files, carrying them to their office, and returning them when done. (Id. at 22:3-24). No one was assigned to help attorney advisors do this lifting. (Id. at 24:16-25:1).

Around May 2005, doctors diagnosed Ms. Ward with lymphedema of the lower right extremity. Lymphedema causes fluid retention and tissue swelling, and can lead to swollen limbs. That same month, Ms. Ward received a review describing her performance as satisfactory, although "it should be noted that throughout the year, Ms. Ward struggled somewhat to keep abreast of the week to week fair share goals. . . . [I]t is expected that she should be able to focus more clearly on increasing decision timeliness and productivity during the upcoming year, in order to further the objectives of the Board." (Dkt. No. 25, Ex. 3).

Ms. Ward's lymphedema caused her to miss a great deal of work. From approximately 2005 to March 2007, she used up all of her leave, including under the Family and Medical Leave Act ("FMLA"). (Dkt. No. 1 ¶ 13; Ward Dep. 74:7-75:1; Dkt. No. 25, Ex. 13). Between April 30, 2006 and September 17, 2006 she worked part time because of her health. (Dkt. No. 25, Exs. 11 & 12). During her part time work, sometimes she could write three opinions per week and

SUMMARY MEMORANDUM AND OPINION; NOT INTENDED FOR PUBLICATION IN THE OFFICIAL REPORTERS

sometimes she could not. (Ward Dep. 69:23-70:1). Her review in March 2006 included nearly identical language as the previous year's: she "had some difficulty in keeping abreast of the week to week fair share goals" but the Department "expected" she would "focus more clearly on increasing decision timeliness and productivity during the upcoming period." (Dkt. No. 25, Ex. 4).

Ms. Ward's lymphedema worsened. At her deposition she stated her condition "began going to the severe stage around the end of 2006, the end of 2007." (Ward Dep. 45:4-9). During the period when she returned to work full time in September 2006 and when she left in 2007, she did not always write three opinions per week. (Id. at 70:2-13).

Ms. Ward first requested an accommodation for her lymphedema around March or April 2007.[2] At her deposition Ms. Ward testified that she asked her supervisor Constance Tobias to be allowed to work from home as an accommodation around March 2007. (Ward Dep. 63:3-64:24). This date is contradicted elsewhere by both Ms. Tobias as well as Ms. Ward herself. At her deposition, Ms. Tobias stated Ms. Ward made no such request to her. (Dkt. No. 25, Ex. 6 at 12:11-13:17). And in a letter authored by Ms. Ward in June 2007, she stated that she first submitted a request for accommodation at the end of April 2007. (Dkt. No. 25, Ex. 14). Also around this time Ms. Ward appears to have had a "fully successful" performance review on April 5, 2007 from Ms. Tobias. (Dkt. No. 26, Ex. 6). The review occurred despite the fact that Ms. Ward "didn't have a lot of work to review and the work that she did submit was submitted to the judge." (Dkt. No. 26, Ex. 7 at 15:3-11). Much of the review form is blank, with no achievement level marked for "timeliness of tentative decisions" or "productivity of decisions," for example. (Dkt. No. 26, Ex. 6). Ms. Tobias left the Department shortly thereafter.

---

[2] As explained below, the exact date is not material to the Court's determination on the summary judgment motions.

After Ms. Tobias left, Mark Greenstreet briefly served as chief judge on Decision Team II, the team Ms. Ward worked with. (Dkt. No. 25, Ex. 9 at 12:2-6). Ms. Ward submitted her request for accommodation to Mr. Greenstreet, spoke to him about her request, and presented him with a March 27, 2007 letter from Dr. David A. Rose about her condition. (Ward Dep. 64:23-24, 72:2-17). Plaintiff gave the letter to Mr. Greenstreet around the second or third week in April. (Id. at 73:11-13). The letter from Dr. Rose is eight sentences. It states in part: "Ms. Ward will benefit from a schedule that allows her to work from home. The maximum number of daily work hours will be determined as the condition stabilizes." (Dkt. No. 25, Ex. 15).

By May 2007, Ms. Ward "had used all of her FMLA substituted paid annual and sick leave either to go home to manage her disability or to go to the hospital for treatment." (Dkt. No. 26, at 18). The Department then approved her for FMLA leave without pay. On May 3, 2007, Ms. Ward attended a meeting with Judge Joaquin Aguayo-Pereles (Deputy Vice Chairman of Decision Team II), Jonathan Kramer (Special Counsel to the Senior Deputy Vice Chairman), and Mr. Greenstreet. At the meeting, the participants told Ms. Ward she needed to provide additional information about her medical condition. (Ward Dep. 78:11-13). That day Ms. Ward was given a memorandum signed by Mr. Greenstreet detailing the additional information required. It states that "additional medical documentation is needed to process your request. Specifically, your physician needs to provide more details concerning the diagnosis and prognosis." The memorandum stated even more information may be required, if necessary. (Dkt. No. 25, Ex. 17).

Shortly after the May 3, 2007 meeting, Steven Cohn became chief veterans law judge of Decision Team II. (Dkt No. 25, Ex. 2 at 29:14-24). Cohn "may" have "r[u]n across" a letter from Mr. Greenstreet about Ms. Ward in her employee file, and asked Mr. Greenstreet about the

status of Ms. Ward's accommodation request "because I think there was a request for medical information that we hadn't gotten." Not much later, a fax arrived from another of Ms. Ward's doctors, Dr. Alice Fuisz, and Mr. Greenstreet shared it with Mr. Cohn. (Id. at 28:22-29:13).

The letter from Dr. Fuisz is undated, although it arrived on or around May 21, 2007. (Dkt. No. 26, Ex. 17 at 22:7-23:10). The letter states that Ms. Ward's condition "causes fatigue" and "can cause significant impairment of daily activities." It notes that her disability "is becoming more debilitating." It continues: "She should sit for only short intervals of time as tolerated . . . . Her right lower extremity is permanently increased in size and weight which substantially limits prolonged sitting, standing, going up and down stairs, or carrying moderately heavy case files, which the patient has to do in order to perform her job duties." Ms. Ward's "disability also affects travel to and from work, but she should be able to commute to work once a week as required." The letter concludes by stating Ms. Ward "needs immediate accommodation of flexible no-pay leave of about 15 to 25 hours a week, in order to continue the daily treatment routines until a work-at-home program is implemented." (Dkt. No. 25, Ex. 13) (emphasis in original).

On May 25, 2007, Mr. Cohn asked to meet with Ms. Ward. This was the first time the two met. At the meeting, Mr. Cohn said to Ms. Ward: "'Look, let's—you know, have you thought about maybe doing part time? What is it that we can do for you?' I asked her to think about that, and I said that we would then meet again." (Dkt. No. 25, Ex. 8 at 13:5-9). According to counsel for Ms. Ward, this conversation constituted an offer to work part time. (Court Tr. at 18:11-13, Oct. 24, 2011). According to Mr. Cohn, it was "a potential solution." (Dkt. No. 25, Ex. 2 at 61:15-23).

On May 31, 2007, Ms. Ward met with Mr. Cohn and Mr. Kramer. Defendant states that Mr. Cohn and Mr. Kramer were concerned based on the information they had that Ms. Ward could not work full time. (Dkt. No. 25 at 4-5). When asked at his deposition whether he told Ms. Ward that Dr. Fuisz's letter did not support her request to work at home full time, Mr. Kramer replied: "Yeah, I believe we did." (Dkt. No. 26, Ex. 16 at 80:24-81:2). Mr. Cohn and Mr. Kramer proposed that Ms. Ward "try it part-time." (Id. at 82:11-12). According to Ms. Ward, Mr. Kramer said: "[Y]our choice is part time work at home or you come to work full time. That's your choice. I said, well, there's got to be something that I can do. That can't be the choice. That's illegal." (Ward Dep. at 94:13-16). Mr. Kramer told Ms. Ward her "doctor has to . . . prove that you can do it." (Id. at 94:17-25). Ms. Ward asked Mr. Kramer to put in writing what additional information she needed to obtain from her physician. (Id. at 95:2-3). Ms. Ward said: "I'm just going to take what you give me so that there's no—nothing lost in the translation. And I'm going to just give it to my doctor and say these are the guidelines, follow them. Issue me another letter so I can submit it to these gentlemen." (Id. at 78:17-22).

On June 5, 2007, Ms. Ward received the Memo from Mr. Cohn formally requesting additional information. (Dkt. No. 25, Ex. 18). The Memo states that the Board of Veterans' Appeals requires additional information to process Ms. Ward's accommodation request. Regarding carrying heavy material such as case files, the Memo notes: "Your physician does not indicate whether your medical condition will allow you to do this once each week." It also states: "Your physician does not indicate that it will be possible for you to sit at your home desk for the length of time necessary to work a full-time schedule." It concludes by asking for a medical statement demonstrating "that your medical condition can be reasonably accommodated through a flexiplace arrangement." (Id.). Although Ms. Ward claims she received this "nearly

three months after Plaintiff first requested an accommodation" (Dkt. No. 26 at 30), if her June 11, 2007 letter is to be believed, it is more like a month and a half. Regardless, it is not in dispute that Ms. Ward never submitted the additional information requested.

On June 11, 2007, Ms. Ward submitted a six-page resignation letter, giving her last day as June 25, 2007. (Dkt. No. 25, Ex. 14). In it she states she has "an edematous disorder which goes haywire very quickly in a few hours if not continuously maintained." (Id.). She worked at the office until June 15, "when she developed lymphangitis and had to go to the hospital for treatment." (Dkt. 36, Response 54). On June 22, 2007, she wrote to the Department that she had "been counseled by the VA Human Resources personnel" to "withdraw my resignation . . . and defer . . . my resignation date . . . ." (Dkt. No. 25, Ex. 22). On July 30, 2007, Ms. Ward wrote to the Department requesting they "process my involuntary resignation/constructive discharge immediately." (Dkt. No. 25, Ex. 23).

Upon reviewing the July 30, 2007 letter, Mr. Kramer "started to seek advice from General Counsel on what we could do, and ultimately I was advised by the Assistant General Counsel that given the fact that she has—although our concerns were—we had valid concerns about whether she could work full time in view of the fact that she had taken this stance about that she's being constructively discharged, that we should have just offered, at that point, offered the arrangement she requested." (Dkt. No. 25, Ex. 5 at 23:11-24:6). Mr. Kramer stated Mr. Ward's July 30 letter "changed her—this letter was concerning to us, because we did not want any kind of—we didn't want to terminate her. That was not what we wanted to do. . . . This was a change of circumstances, and we made the decision that we made." (Dkt. No. 25, Ex. 16 at 92:18-93:7).

Around August 8, 2007, Defendant sent a letter to Plaintiff signed by Kevin Taugher. Mr.

Taugher, Chief of Human Resources, worked for Martin Yancey, the Board's Administrative Officer. (Dkt. No. 25, Ex. 10 at ¶ 3). The letter notes the Board had offered Plaintiff "a work-at-home arrangement in conjunction with part-time status," and told Plaintiff that "although you never submitted any additional medical information as requested, the Board has nevertheless reconsidered your reasonable accommodation request and is willing to consider allowing you to try work-from-home on a full-time basis. Therefore, if you remain interested in pursuing such an arrangement, please respond to me in writing within 5 days of the date of this letter that you still wish us to pursue this accommodation and we will begin the process of establishing your work-from-home arrangement." (Dkt. No. 25, Ex. 24). Plaintiff did not respond to the letter, which she received around August 14th or 15th. (Ward Dep. 177:18-25).

On November 6, 2007, the Department of Veterans Affairs granted Ms. Ward disability retirement. (Dkt. No. 25, Ex. 25). She received a Notice of Suit Rights from the EEOC dated May 28, 2010, and commenced this action on August 23, 2010. (Dkt. No. 1 at ¶ 6).

## II. Legal Standards

### A. Summary Judgment

Summary judgment is appropriate when the moving party demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Moore v. Hartman, 571 F.3d 62, 66 (D.C. Cir. 2009) (citing FED. R. CIV. P. 56(c) and Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986)). A genuine issue of material fact exists if the evidence "is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Id. at 252.

### B. Discrimination Under The Rehabilitation Act

Section 504 of the Rehabilitation Act (the "Act") provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or . . . conducted by any Executive agency . . . ." 29 U.S.C. § 794(a). In addition, federal employers must take affirmative action on behalf of disabled persons pursuant to Section 501(b) of the Act. 29 U.S.C. § 791(b). At its core, the Rehabilitation Act requires the federal government to "take reasonable affirmative steps to accommodate the handicapped, except where undue hardship would result." Barth v. Gelb, 2 F.3d 1180, 1183 (D.C. Cir. 1993). Regulations for the Americans with Disabilities Act have been incorporated as Rehabilitation Act regulations applicable to federal agencies. See 29 C.F.R. § 1614.203(b).

"To establish a *prima facie* case of discrimination under the Rehabilitation Act for failure to accommodate, a plaintiff must show (1) that [she] was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of [her] disability; (3) that with reasonable accommodation [she] could perform the essential functions of the position; and (4) that the employer refused to make the accommodation." Graffius v. Shinseki, 672 F. Supp. 2d 119, 125 (D.D.C. 2009) (quotations and citations omitted). In a case for failure to accommodate under the Act, a plaintiff must prove "by a preponderance of the evidence that she has a disability, but with a reasonable accommodation (which she must describe), she can perform the essential functions of her job." See Flemmings v. Howard Univ., 198 F.3d 857, 861 (D.C. Cir. 1999). "If a disabled employee shows that her disability was not reasonably accommodated, the employer will be liable *only* if it bears responsibility for the breakdown of

9

the interactive process." Alston v. Washington Metro. Area Transit Auth., 571 F. Supp. 2d 77, 86 (D.D.C. 2008) (quoting E.E.O.C. v. Sears, Roebuck & Co., 417 F.3d 789, 797 (7th Cir. 2005). The definition of reasonable accommodation includes "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii).

A plaintiff claiming constructive discharge must demonstrate: "(1) intentional discrimination existed, (2) the employer deliberately made working conditions intolerable, and (3) aggravating factors justified the [plaintiff's] conclusion that [she] had no option but to end [her] employment." Bryant v. Pepco, 730 F. Supp. 2d 25, 32 (D.D.C. 2010) (quotations and citations omitted). Thus a plaintiff must demonstrate that "the employer deliberately created intolerable work conditions that forced the plaintiff to quit." See Veitch v. England, 471 F.3d 124, 130 (D.C. Cir. 2006) (citation omitted).

### III. Analysis

#### A. The Department Acted In Good Faith During The Interactive Process

The Department understandably felt that it needed additional information about Ms. Ward's condition because the two letters it had received raised legitimate concerns about her abilities. "Once the employer knows of the disability and the employee's desire for accommodations, 'it makes sense to place the burden on the employer to request additional information that the employer believes it needs.'" Woodruff v. LaHood, 777 F. Supp. 2d 33, 41 (D.D.C. 2011) (citations omitted); see also 29 C.F.R. pt. 1630 app. § 1630.9 ("When the need for an accommodation is not obvious, an employer, before providing a reasonable accommodation, may require that the individual with a disability provide documentation of the need for

accommodation."). Days after receiving a request for additional information the Department felt it needed, Ms. Ward submitted a letter of resignation. "A party that fails to communicate, by way of initiation or response, may be acting in bad faith." Woodruff, F. Supp. 2d at 41 (citing Beck v. Univ. of Wis. Bd. of Regents, 75 F.3d 1130, 1135-56 (7th Cir. 1996)). Such is the case here when Ms. Ward walked away from the interactive process. See, e.g., Pamon v. Bd. of Trs. of Univ. of Ill., No. 09 C 5034, 2011 WL 3584334, at *5 (N.D. Ill. Aug. 8, 2011) ("Because the Board did not create the communication breakdown, the Board cannot be held liable for the consequences.")

To determine whether the Department failed to reasonably accommodate Ms. Ward, an examination must be made of whether a "good faith interactive process" took place between the parties. See Koch v. Schapiro, 759 F. Supp. 2d 67, 76 (D.D.C. 2011). Ms. Ward "must show that the results of the inadequate interactive process was the failure of the [Department] to fulfill its role in determining what specific actions must be taken by an employer in order to provide the qualified individual a reasonable accommodation." Id. (quotations and citations omitted). "Once this process has begun, both the employer and the employee have a duty to act in good faith." Id. (citation omitted). To demonstrate good faith, an employer can: "meet with the employee who requests an accommodation, request information about the condition and what limitations the employee has, ask the employee what he or she specifically wants, show some sign of having considered employee's request, and offer and discuss available alternatives when the request is too burdensome." Woodruff, 777 F. Supp. 2d at 41-42 (citations omitted).

The Department easily satisfies the test for good faith. As noted above, one sign of an employer acting in good faith is requesting information from the employee as part of an interactive process. Here the Department sought clarification from Ms. Ward's doctors because

the information it had received did not provide sufficient detail. Courts have found requests for additional medical information to be part of a demonstration of good faith, especially when the employee ultimately fails to provide the information requested. See, e.g., Steffes v. Stepan Co., 144 F.3d 1070, 1072-73 (7th Cir. 1998) (finding employee "failed to hold up her end of the interactive process by clarifying the extent of her medical restrictions" after providing two submissions one month apart from her doctor that required additional clarification); Stine v. Pa. State Police, No. 1:09-CV-944, 2012 WL 959362, at *8 (M.D. Pa. March 21, 2012) (denying plaintiff's motion for partial summary judgment after plaintiff submitted medical information found to be inadequate on two separate occasions and then claimed that defendant should have requested additional information, when in fact "the onus was on him"). Also, the Department requested information in a way that, regardless of the slight discrepancy regarding when Ms. Ward first requested an accommodation, can in no way be considered untimely. When Ms. Ward abandoned the interactive process, it had been going on at most three months, and seems likely to have been even less. See, e.g., Mayers v. Laborers' Health & Safety Fund of N. Am., 478 F.3d 364, 368 (D.C. Cir. 2007) (merely doubting, but not deciding, that a three-year delay in accommodation is not actionable under the ADA).

The Department's actions satisfy other tests of good faith outlined in Woodruff. Another indication of good faith is meeting with the employee to discuss the best course to take. Very shortly after she requested an accommodation, the Department began a dialogue with Ms. Ward. There were several meetings over just a few weeks. Ms. Ward produced some information requested of her, to be sure, but that information failed to adequately clarify her condition and thus the proper accommodation. "An employee seeking an accommodation for a disability must comply with an employer's reasonable request for medical documentation." Gard v. U.S. Dep't

of Educ., 691 F. Supp. 2d 93, 100 (D.D.C. 2010). On May 31, Ms. Ward indicated that she would provide the additional information requested of her, but did not do so. "When the interactive process breaks down, courts should attempt to isolate the cause of the breakdown and then assign responsibility to the culpable party." Woodruff, 777 F. Supp. 2d at 42. After Ms. Ward's request for accommodation, the Department reacted quickly, kept in frequent contact, and requested information it felt necessary to come to a proper conclusion. Therefore it cannot be found to have acted in bad faith during the interactive process. "An employer is not required to provide an accommodation prior to receiving medical documentation that substantiates the employee's need for accommodation." Graffius, 672 F. Supp. 2d at 130 (quotations and citations omitted).

Finally, Ms. Ward claims that the Department failed to follow internal policy on providing reasonable accommodation, in part because certain people she dealt with during the good faith interactive process were not the proper decisionmakers. Even if true, which the Department disputes, this is irrelevant. The Department officials participating in the interactive process were not prohibited under the Act from approving requests for reasonable accommodation, and are actually encouraged to do so. See Matta v. Snow, No. Civ.A. 02-862, 2005 WL 3454334, at *27 (D.D.C. 2005). Moreover, the alleged failure by the Department is not a per se violation of the Act. See Washington v. Chao, 577 F. Supp. 2d 27, 43 (D.D.C. 2008) ("[P]rocedural irregularities are insufficient to find discrimination where they are unrelated to any prohibited motive under Title VII.").

### B. No Reasonable Juror Could Find That The Department Failed To Accommodate

There are no material facts in dispute that would allow a reasonable juror to find that the Department failed to reasonably accommodate Ms. Ward. Perhaps the fundamental problem

with Ms. Ward's claim of failure to accommodate is that not only did the Department not "refuse[ ] to make the accommodation," Graffius, 672 F. Supp. 2d at 125, it offered her the exact accommodation she sought. Ms. Ward wanted to work at home full time, and yet she "failed to take advantage of a reasonable accommodation by not providing medical documentation." See Carroll v. England, 321 F. Supp. 2d 58, 69 (D.D.C. 2004). To determine a reasonable accommodation, parties "must exchange essential information and neither side can delay or obstruct the process." Id. (quotations and citation omitted).

Despite Ms. Ward abandoning the interactive process, the Department still contacted her to offer her what she wanted. The August 8, 2007 letter states that if Ms. Ward is still interested, she should contact the Department and they "will begin the process of establishing your work-from-home arrangement." (Dkt. No. 25, Ex. 24). The only fair reading of this letter is as an offer with the terms sought by Ms. Ward.

This Court cannot reward Ms. Ward for walking away from a discussion about what to do and ultimately rejecting an offer of exactly what she requested. At the May 31, 2007 meeting where the Department requested additional information from Ms. Ward, she stated she would request the information from her doctor and provide it. (Ward Dep. 78:17-22). She did not. After receiving an offer nonetheless for the accommodation she requested, she took no action. "[I]t was ultimately the Plaintiff that failed and/or ended the good faith interactive process to determine the feasibility of the accommodation . . . ." Koch, 759 F. Supp. 2d at 76. Ms. Ward cites to no cases, and this Court can find none, supporting the proposition that a plaintiff can abandon the interactive process, later reject the exact accommodation sought, and yet still prevail on a Rehabilitation Act claim. This Court declines the opportunity to take such a course.

Ms. Ward states that the Department denied her request to accommodate her in her full-

time status based on the Department's answer to paragraph 25 of the Complaint. The Department stated that it "admits that Plaintiff's accommodation request to 'work at home on a full-time basis' was initially denied." (Dkt. No. 2 at ¶ 25). Positions often change during an interactive process. Ms. Ward would have this Court ignore the word "initially," and ignore the interactive process that took place. Under no fair reading of the record can it be said, as Ms. Ward claims, that the Department terminated the interactive process on May 31, 2007. At that meeting Ms. Ward asked the Department to put its request for additional information in writing, and stated she would give it to her doctor. The Department did what it said it would do. Ms. Ward did not. To conclude from this that the Department terminated the process would be to distort the record.

After receiving the Department's offer of a full-time at-home accommodation, Ms. Ward never responded. She offers several reasons for her failure, although all are far from persuasive. One is that the offer was contradictory in its terms. While not a model of clarity, no reasonable person could read the letter and think anything other than that they were being offered an accommodation to work at home full time. Two, she rightly notes that the letter asked for a response within five days and yet she claims to have received it after five days. But Ms. Ward made no effort to find out if the offer was still open, the course of action someone desiring to continue the interactive process would have taken. Three, she claims the letter was signed by Mr. Taugher, who was not the proper person to communicate with her about this matter. And while the Department persuasively disputes this claim (Mr. Taugher worked for Mr. Yancey, to whom Ms. Ward directed her resignation letter), it hardly matters: the letter offered her what she wanted, and was signed by the Chief of Human Resources for the Board of Veterans' Appeals. There is no indication the offer lacks genuineness, and Ms. Ward made no inquiry to test that

possibility.

**C. Ms. Ward Failed To Demonstrate That She Can Perform The Essential Functions Of Her Job**

Plaintiff's frequent leave and regular need for treatment raised a clear question of whether she could perform the essential functions of her job even with reasonable accommodation. A "qualified handicapped person" can perform the essential functions of their position, with or without reasonable accommodation, without endangering themselves or others. See Carr v. Reno, 23 F.3d 525, 529 (D.C. Cir. 1994). "[A]n essential function of any government job is an ability to appear for work (whether in the workplace or, in the unusual case, at home) and to complete assigned tasks within a reasonable period of time." Id. at 530. The Department had previously raised concerns about Ms. Ward's ability to meet her work goals, and because of her lymphedema she had missed a great deal of work. When Ms. Ward abandoned the interactive process, she had yet to produce medical information clearly indicating her ability to do all of the tasks required of her.

The information Ms. Ward provided to the Department before she abandoned the interactive process does not reveal that she could perform the basic elements of her job. Dr. Rose's letter states that "[t]he maximum number of daily work hours will be determined as the condition stabilizes." (Dkt. No. 25, Ex. 15). This does not settle whether working from home full time would be a reasonable accommodation for Ms. Ward. The letter from Dr. Fuisz states Ms. Ward's condition "substantially limits prolonged sitting, standing, going up and down stairs, or carrying moderately heavy case files, which the patient has to do in order to perform her job duties." (Dkt. No. 25, Ex. 13). Dr. Fuisz's letter is not even clear on whether Ms. Ward can come into the office once a week; it merely states she "should" be able to do so. (Id.). The

information Ms. Ward produced from her doctors raised more questions than it answered, which is why the Department sought additional material.

Ms. Ward's job required her to concentrate and write opinions based on case files she had to carry back and forth to her office space. A full time employee was expected to work between 8.5 to 10 hours per day, and this work could be done any time between 6 a.m. and 6 p.m. (Dkt. No. 26, at 31). The daily workday includes a 30 minute break for lunch and two 15 minute breaks. Treatment of her lymphedema could take up to three hours per day. (Dkt. No. 25, Ex. 13). Based on this the Department had legitimate concerns about whether enough time in the day remained for Ms. Ward to work, and the information she provided did not alleviate those concerns.

Ms. Ward claims the Department "had no objective basis—medical or otherwise—upon which to conclude that Plaintiff would be unable to meet her annual productivity requirement were she to work from home full-time." (Dkt. No. 26, at 16). This is contradicted by the record. Ms. Ward received reviews indicating problems with her productivity during her time at the Department, and repeatedly missed work. The information obtained from her doctors did nothing to settle this point: one letter said the amount of hours would need to be determined in the future, while the other noted several limitations on her mobility.

**D. Ms. Ward's Claim Of Constructive Discharge Fails Because There Is No Evidence Of Intentional Discrimination Or That The Department Deliberately Sought To Make Conditions Intolerable**

Ms. Ward claims she was constructively discharged essentially because the Department suggested she consider working part time and asked her for additional medical information. This is largely the same argument advanced for her reasonable accommodation claim. The Department's actions fall far short of satisfying the elements of a constructive discharge claim.

As discussed above, the Department engaged in good faith in an interactive process with Ms. Ward.  There is nothing in the record to support a claim of intentional discrimination by the Department.  There is nothing in the record to support a claim that the Department deliberately made Ms. Ward's working conditions intolerable.  And the fact that the Department offered her the accommodation she sought indicates there can be no legitimate argument that "aggravating factors" justified Ms. Ward's decision to leave.  Bryant, 730 F. Supp. 2d at 32 (citations omitted).  Ms. Ward fails to establish that a reasonable person in her position would have felt she had no option but to quit.  See Cannon v. Paulson, 531 F. Supp. 2d 1, 7 (D.D.C. 2008).

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment, (Dkt. No. 25), is **GRANTED**, and Plaintiff's Motion for Summary Judgment, (Dkt. No. 26), is **DENIED**.  An Order accompanies this Memorandum.


Date: November 19, 2012

ROBERT L. WILKINS
United States District Judge